# United States Court of Appeals

## For the First Circuit

No. 07-2780

DRINI BEBRI,

Petitioner,

v.

MICHAEL B. MUKASEY, ATTORNEY GENERAL,

Respondent.

PETITION FOR REVIEW OF AN ORDER OF THE BOARD

OF IMMIGRATION APPEALS

Before

Howard, Baldock,* and Selya,
Circuit Judges.

William P. Joyce and Joyce & Associates P.C. on brief for
petitioner.
Gregory G. Katsas, Acting Assistant Attorney General, Anthony
W. Norwood, Senior Litigation Counsel, and Shahrzad Baghai, Trial
Attorney, on brief for respondent.

October 17, 2008

*Of the Tenth Circuit, sitting by designation.

**SELYA**, **Circuit Judge**.  The petitioner, Drini Bebri, is an Albanian national.  He seeks judicial review of a final order of the Board of Immigration Appeals (BIA) that affirmed a decision of an immigration judge (IJ) denying his applications for asylum, withholding of removal, and relief under the Convention Against Torture (CAT).  Because the petitioner failed to renew the withholding of removal and CAT claims before the BIA, we treat those claims as abandoned.  See Makhoul v. Ashcroft, 387 F.3d 75, 80 (1st Cir. 2004).  Consequently, our sole focus is the asylum claim.  After careful consideration of that claim, we deny the petition.

The petitioner entered the United States illegally on February 4, 2001.  He immediately applied for asylum.  An asylum officer interviewed him and referred his case to the immigration court.

After the petitioner amended his asylum application on May 16, 2002, the IJ convened an evidentiary hearing.  Following that hearing, the IJ concluded that the petitioner's testimony was not credible and refused to grant asylum.  The IJ premised her adverse credibility determination (and, hence, the denial of asylum) on perceived inconsistencies in the petitioner's presentation.  We turn, then, to the petitioner's testimony.

The petitioner testified that, in 1999, he was an officer of the Democratic Party of Albania (PD).  He started to receive

unsigned letters threatening to kill him if he did not leave the party. He remained steadfast.

The linchpin of his account was an incident that he said occurred in October of 2000. As he described it, he was savagely beaten by a group of masked men after working in a parliamentary election. His assailants threatened further violence if he did not stop toiling for the PD. The petitioner finally escaped from his tormentors and, shortly thereafter, traveled to the Albanian capital (Tirana). He obtained a counterfeit Italian passport there. Using this bogus credential, he embarked on a lengthy peregrination through Italy, Belgium, France, Spain, Venezuela, and Colombia before flying into Miami.

The IJ discerned serious discrepancies in this account. The most glaring contradictions involved the linchpin event: the circumstances of the supposed beating. In his initial asylum application, the petitioner had described two incidents, not one. He said that "approximately two-three days" after the election, he was attacked by two men; that he was beaten so severely that he needed to be hospitalized; and that, seven days later, he was again confronted by the same men. In his amended asylum application, however, he stated that he had experienced only one encounter — he was beaten and threatened "at a rally." When testifying before the IJ, the petitioner admitted that this was a lie; instead, he

vouchsafed that the beating occurred while he was walking home from the parliamentary election after the votes had been counted.

This version itself cast further doubt on his veracity. The petitioner testified that the beating lasted about twenty minutes and did not require hospitalization. Later in the hearing, however, he testified to leaving the polls before the votes were counted and being beaten for "about three hours."

The petitioner had no plausible explanation for any of these inconsistencies, and the IJ thought that they were telling. She also questioned the depth of the petitioner's commitment (if any) to the PD. And, finally, she observed that other parts of the petitioner's story, though consistent, seemed far-fetched. In this regard, she pointed to the petitioner's assertions that he had walked for four to five hours after absorbing a three-hour beating; that he had developed, virtually instantaneously and without assistance, an effective escape route that allowed an alien with no legitimate passport to enter the United States; and that he had financed his entire sojourn, flying on commercial aircraft, for under $3,500.

Based on these and similar findings, the IJ denied the petitioner's application for asylum and ordered his removal. On November 7, 2007, the BIA affirmed. This timely petition for judicial review followed.

Following a final order of removal, this court ordinarily reviews the decision of the BIA. But where, as here, the BIA adopts portions of the IJ's opinion, we review those portions of the IJ's opinion as well. Romilus v. Ashcroft, 385 F.3d 1, 5 (1st Cir. 2004). Factual findings, including credibility determinations, are reviewed under the substantial evidence standard. Segran v. Mukasey, 511 F.3d 1, 5 (1st Cir. 2007). Under this deferential standard, contested findings will stand as long as they are "supported by reasonable, substantial, and probative evidence on the record considered as a whole." Id. (quoting INS v. Elias-Zacarias, 502 U.S. 478, 481 (1992)). Unless the evidence "compels a contrary conclusion, the findings must be upheld." Id.

Asylum is available only to a refugee. A refugee is a person who is unable or unwilling to return to his or her homeland "because of persecution or well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A). It is an asylum-seeker's burden to prove that he or she is a refugee within the statutory definition. See Jiang v. Gonzales, 474 F.3d 25, 30 (1st Cir. 2007).

To carry this burden, an alien's own testimony may suffice. See Settenda v. Ashcroft, 377 F.3d 89, 93 (1st Cir. 2004). But an alien's testimony need not be taken at face value; if the trier deems that testimony speculative or unworthy of

credence, "it may be either disregarded or sharply discounted." Nikijuluw v. Gonzales, 427 F.3d 115, 121 (1st Cir. 2005). In that way, "an adverse credibility determination can prove fatal" to an asylum claim. Pan v. Gonzales, 489 F.3d 80, 86 (1st Cir. 2007).

Either past persecution or a well-founded fear of future persecution on account of a protected ground is a sine qua non for asylum. 8 U.S.C. § 1101(a)(42)(A). In the case at hand, the petitioner relies on a claim of past persecution to give rise to a reasonable possibility that such persecution will recur if he is repatriated. See Makhoul, 387 F.3d at 81. His showing of past persecution hinges on the linchpin incident: the savage beating that he claims was administered to punish him for his political beliefs. Apart from the petitioner's unsupported allegations of anonymous threats, that is the only tangible evidence of any past persecution specific to him.

The IJ concluded that both the beating and the petitioner's professed degree of political participation were apocryphal. Accordingly, she denied his asylum application. The petitioner assigns error in two respects. First, he asserts that the IJ based her adverse credibility determination on matters that were not central to the merits of the asylum claim. Second, he argues that the IJ's adverse credibility determination is not supported by the record as a whole. We address those plaints sequentially.

The premise on which the first claim of error rests — the so-called "heart of the matter" rule — is theoretically sound.[1] Under the heart of the matter rule, discrepancies relied upon by the trier in making adverse credibility determinations must "pertain to facts central to the merits of the alien's claims, not merely to peripheral or trivial matters." Zheng v. Gonzales, 464 F.3d 60, 63 (1st Cir. 2006). Put another way, an adverse credibility determination "cannot rest on trivia but must be based on discrepancies that involved the heart of the asylum claim." Bojorques-Villanueva v. INS, 194 F.3d 14, 16 (1st Cir. 1999) (citation and internal quotation marks omitted).

The conclusion that the petitioner seeks to have us draw from this premise, however, is not sound. He attempts to depict the inconsistencies that permeated his shifting statements as minor differences of time and place. But every case is different; and here, that characterization is misleading. Although most of the discrepancies concern the time, place, or manner of various details incident to the alleged beating, they go to the heart of the matter. We explain briefly.

---

[1] That is true here, but it may not be true in future cases. The REAL ID Act of 2005, Pub. L. 109-13, 119 Stat. 302, abolishes the heart of the matter rule. See id. § 101; see also Cuko v. Mukasey, 522 F.3d 32, 38 n.2 (1st Cir. 2008). Nevertheless, the Act only applies to claims for asylum filed after May 11, 2005. See REAL ID Act of 2005 § 101(h)(2). Because the petitioner filed for asylum several years earlier, his case remains subject to the rule.

The petitioner variously described the beating as having taken place at a rally or during a stroll home from the polls. He said, at different times, that it occurred both before and after the votes were tallied. He estimated its duration on one occasion as twenty minutes and on another as three hours. He vacillated as to whether or not his injuries required hospitalization. And he first described a pair of incidents, and then retracted to a single incident.

Viewed collectively and in context,[2] the petitioner's wildly inconsistent statements about the timing, location, duration, and intensity of the alleged beating would raise a serious question in the mind of even the most sanguine listener as to whether the petitioner was beaten at all. Such inconsistencies surely can ground a finding that an alien's testimony is lacking in veracity. See, e.g., Pan, 489 F.3d at 86. What we wrote in Pan is equally apposite here: "Some of these inconsistencies, in isolation, may seem like small potatoes. What counts, however, is that their cumulative effect is great." Id.

The petitioner's fallback position is that the IJ's adverse credibility determination (and, thus, the denial of asylum) was not rooted in the record as a whole. This argument is fueled by the petitioner's assertion that the IJ had an insufficient basis

---

[2] The context here includes the utter lack of any corroboration (documentary or anecdotal) and the petitioner's admission that he lied initially.

-8-

for concluding (i) that the petitioner was not as active in the PD as he professed to be and (ii) that the petitioner's circuitous route from Albania to the United States was pre-planned.

We set the stage. During the hearing, the petitioner, who claimed to be an officer of the PD and active in its affairs, was questioned about the political climate in Albania at the time he was living there. He gave stumbling and inaccurate responses to rudimentary questions,[3] which led the IJ to conclude that he may well have been prevaricating about his status as a political activist. The petitioner points out that in order to have reached this conclusion, the IJ had to assume that someone who was active in politics at a given time would know more than the petitioner did. The petitioner styles that assumption as representing nothing more than the IJ's personal view and, therefore, as not entitled to deference. See Cordero-Trejo v. INS, 40 F.3d 482, 487 (1st Cir. 1994) ("[D]eference is not due where findings and conclusions are based on inferences or presumptions that . . . are merely personal views of the immigration judge."). This argument lacks force.

We can find no fault with the IJ's assumption that, in the normal course of events, someone who has worked for a number of

---

[3] To cite one illustration, when asked whether he ever had heard of the political party known as the "PDSH," the petitioner responded in the negative. But the record contains a report of an international organization verifying that the PDSH had won over a third of all Albanian parliamentary seats in 1997 and again in 2001.

years in a field will know and recall elementary facts about that field.  Unlike the premise used by the IJ in <u>Cordero-Trejo</u>, the premise employed by the IJ in this case is grounded in common sense, not in the IJ's esoteric knowledge or personal experience.  A trial judge has a right — indeed, a duty — to make common-sense judgments.  That duty is implicit in our system of justice.  <u>See</u> <u>Griffin</u> v. <u>Burns</u>, 570 F.2d 1065, 1078 (1st Cir. 1978) (stating that "a federal judge . . . may and should do what common sense and justice require").  It is equally implicit in an IJ's statutory mandate to "decide whether an alien is removable from the United States."  8 U.S.C. § 1229a(c)(1)(A).  Given that the petitioner has furnished no coherent reason as to why an officer of the PD would have been so uninformed, the IJ's conclusion passes muster under the substantial evidence standard.

This brings us to the matter of the itinerary.  Referring to the petitioner's hegira, the IJ observed:

> The Court has seen many, many of these . . . I find it simply incredulous [sic] that the [petitioner] would simply come up with this itinerary on his own.  It is certainly well-known that there is a great deal of human trafficking from Albania and this certainly fits the pattern.

The perceived similarity of the petitioner's route to that conventionally used by human-smuggling operations prompted the IJ to conclude that the petitioner had in all likelihood contracted with a smuggler to effect his entry into the United States.

-10-

The petitioner contends that the IJ improperly relied upon her personal knowledge of frequently used human-trafficking routes to conclude that the petitioner had been less than candid about the spontaneity of his travels. There may be some merit to this contention; the IJ needed more than unvarnished common sense to reach this conclusion, and the record is barren of any pertinent evidence of human-trafficking routes.

In the last analysis, we need not decide this point. Even assuming, for argument's sake, that the IJ's views about the origin of the petitioner's itinerary were misplaced, that subject was peripheral to the merits of his asylum claim. Moreover, in the overall scheme of things, it was only marginally relevant to his credibility. The record reveals a plethora of other facts that strongly support the IJ's adverse credibility determination. Because that determination rested on substantial evidence in the record as a whole (not including the origin of the petitioner's itinerary), any error in this regard was harmless. See Harutyunyan v. Gonzales, 421 F.3d 64, 70 (1st Cir. 2005) (explaining that, in an immigration case, a harmless error is one "that would [not] have made a dispositive difference in the outcome of the proceeding").

We need go no further. For the reasons elucidated above, we conclude that the denial of asylum is supported by substantial evidence in the record. Consequently, the order of removal must be upheld.

**The petition for judicial review is denied**.